UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

LOUIS VUITTON MALLETIER S.A.,

                     Plaintiff,

      -v-

SUNNY MERCHANDISE CORP. *d/b/a* SUNNY
SUNGLASSES et al.,

                 Defendants.

------------------------------------------------------------X

13 Civ. 5242 (LAP)

OPINION & ORDER

LORETTA A. PRESKA, Chief United States District Judge:

    Louis Vuitton Malletier S.A. ("Louis Vuitton") brings this suit against Sunny

Merchandise Corp. ("Sunny"), Louis Valentin Eyewear, and Sunny's founder and president,

Chin Zong Tsai ("Gene Tsai" or "Tsai"), asserting various federal and state trademark claims.

Louis Vuitton challenges Sunny's use of the marks "LOUIS VALENTIN" and "LOUIS•V" on

its sunglasses, as well as Sunny's use of several designs that Louis Vuitton believes are

confusingly similar to its Damier, LV, and Flower Marks.  Before the Court are cross-motions

for partial summary judgment and three motions by Defendants to exclude Plaintiff's experts.

Additionally, Defendants have submitted a list of evidentiary objections to Plaintiff's motion for

partial summary judgment, Plaintiff has objected to the "additional facts" that Defendants

included in their response to Plaintiff's Rule 56.1 statement, and both parties have requested

redactions.

    For the reasons stated below, Plaintiff's motion for partial summary judgment is

GRANTED with respect to its trademark infringement claims and DENIED with respect to its

counterfeiting claims.  Defendants' motion for partial summary judgment is DENIED with

respect to Louis Vuitton's counterfeiting claims but GRANTED with respect to Louis Vuitton's claims against Gene Tsai. Both Plaintiff's and Defendants' objections associated with their motions for partial summary judgment are DENIED. In addition, Defendants' motion to exclude the testimony of proposed branding and marketing expert Seth Matlins is GRANTED in part and DENIED in part, while their other motions to exclude Plaintiff's experts are DENIED. Lastly, both parties' requests for redactions are GRANTED in part and DENIED in part.

## BACKGROUND

The following facts, drawn from the admissible materials submitted by the parties, are undisputed except where noted. *See Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). Louis Vuitton is a "global luxury brand company" that manufactures a variety of products, including sunglasses. (Statement Undisputed Facts Pursuant Fed. R. Local Rule 56.1 ("Pl.'s Rule 56.1 Statement") (Docket No. 49) ¶¶ 1, 3). The company owns several federal trademark registrations. As relevant here, these registrations include the Louis Vuitton Mark, the LV Mark, the Damier Marks,[1] and the Flower Marks. (Pl.'s Rule 56.1 Statement ¶ 6). All of Louis Vuitton's sunglasses feature the Louis Vuitton mark, and the other marks appear on certain styles. (Pl.'s Rule 56.1 Statement ¶ 24).

Sunny, which was founded by Gene Tsai and his wife, imports and sells inexpensive sunglasses made in China. (Pl.'s Rule 56.1 Statement ¶ 82). Tsai is Sunny's president and until 2012 was, along with his wife, its sole shareholder, although Defendants contend that he has not been involved in the management of the company since 2003, when he had a heart attack. (Pl.'s Rule 56.1 Statement ¶¶ 88-89; Defs.' Response Pl.'s Statement Undisputed Facts Pursuant Fed. R. Local Rule 56.1 ("Defs.' Counter-Statement") (Docket No. 87) ¶ 89; Defs.' Rule 56.1

---

[1]     The Damier Mark registrations do not cover sunglasses. (Pl.'s Rule 56.1 Statement ¶ 6).

Statement Material Facts ("Defs.' Rule 56.1 Statement") (Docket No. 56) 4-5).  In 2009, Sunny

began selling sunglasses with the marks LOUIS VALENTIN and LOUIS•V, which were

"inspired by" Louis Vuitton.  (Pl.'s Rule 56.1 Statement ¶¶ 29-30; Decl. Michael J. Allan

("Allan Decl.") (Docket No. 53) Ex. 13 at 152:9).  Although Sunny is a California company and

was founded in 1978, some of Sunny's sunglasses feature the words "Paris," "Est. 1941," or

both.  (Pl.'s Rule 56.1 Statement ¶¶ 33, 35, 82).  Further, several third-party companies that sell

LOUIS•V and LOUIS VALENTIN products use phrases such as "compare to Louis Vuitton"

(Pl.'s Rule 56.1 Statement ¶ 46) or incorporate Louis Vuitton's marks in their advertising of

Sunny's products (Pl.'s Rule 56.1 Statement ¶ 47).

     Louis Vuitton filed this action on July 26, 2013, alleging various Lanham Act claims

(Compl. (Docket No. 1) ¶¶ 43-68), as well as associated state law claims (Compl. ¶¶ 69-81).  It

filed a motion for partial summary judgment on August 4, 2014, arguing that it was entitled to

judgment as a matter of law against Sunny and Tsai on its counterfeiting claims and against

Sunny on its federal trademark infringement and false designation of origin claims, as well as its

state law trademark infringement and unfair competition claims.  (Docket No. 47).  On the same

day, Defendants filed a cross motion for partial summary judgment as to all of Louis Vuitton's

counterfeiting claims and its claims against Tsai.  (Docket No. 52).  Defendants also seek to

exclude the reports and testimony of Plaintiff's three proposed experts.  (Docket Nos. 99, 103,

106).

## DISCUSSION

**A.      Cross-Motions for Summary Judgment**

Summary judgment is appropriate where the admissible evidence and the pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over an issue of material fact qualifies as genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322–23); *accord PepsiCo, Inc. v. Coca–Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002).

In ruling on a motion for summary judgment, all evidence must be viewed "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). To defeat a motion for summary judgment, the non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on

the allegations in [its] pleading or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted).  Affidavits submitted in support of or in opposition to summary judgment must be based on personal knowledge, must "set forth such facts as would be admissible in evidence," and must show "that the affiant is competent to testify to the matters stated therein." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004).

### 1.    *Louis Vuitton's Motion for Summary Judgment on Trademark Infringement*

Louis Vuitton argues that Sunny is liable for trademark infringement as a matter of law with regard to Sunny's LOUIS VALENTIN and LOUIS•V marks.  To prevail on a trademark infringement claim brought under the Lanham Act, a plaintiff must show both that its mark is entitled to protection and that "defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods." *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003); *see also Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1074 (2d Cir. 1983).  Here, only the second factor — likelihood of confusion — is in dispute.  Further, "[t]hough likelihood of confusion is frequently a fairly disputed issue of fact . . . the issue is amenable to summary judgment in appropriate cases." *Warner Bros. Inc. v. Am. Broad. Cos.*, 720 F.2d 231, 246 (2d Cir. 1983).

In the Second Circuit, courts generally consider the nonexclusive list of factors outlined by Judge Friendly in *Polaroid Corp. v. Polaroid Electronics Corp.*, 287 F.2d 392 (2d Cir. 1961), in deciding whether a likelihood of confusion exists.  These factors are: "(1) the strength of the plaintiff's mark; (2) the degree of similarity between the two marks; (3) the competitive proximity of the products or services; (4) the existence of actual confusion; (5) the likelihood that the plaintiff will 'bridge the gap' between the two markets; (6) the defendant's good faith in

adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of the purchasers." *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 256-57 (2d Cir. 1987) (quoting *Polaroid*, 287 F.2d at 495); *see also NYP Holdings v. N.Y. Post Pub'g Inc.*, No. 14-CV-8310 (VM), 2014 WL 6603989, at *6 (S.D.N.Y. Nov. 17, 2014). The likelihood of confusion inquiry, however, "is not a mechanical process where the party with the greatest number of factors weighing in its favor wins." *Vox Amplification Ltd. v. Meussdorffer*, No. 13-CV-4922 (ADS) (GRB), – F.Supp.3d –, 2014 WL 4829578, at *14 (E.D.N.Y. Sept. 29, 2014) (internal quotation marks omitted). Instead, "a court should focus on the ultimate question of whether consumers are likely to be confused." *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000).

Here, most of the individual *Polaroid* factors support Louis Vuitton's position. When viewed holistically in light of the ultimate question of confusion, the analysis comes out even more strongly in favor of granting Louis Vuitton's partial motion for summary judgment on its infringement claims. *See, e.g.*, *The Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 960 (2d Cir. 1996) (finding that summary judgment based on a likelihood of confusion under the *Polaroid* analysis "is appropriate where the undisputed evidence would lead only to one conclusion."). Of particular importance to the Court in reaching this conclusion is the strength of Louis Vuitton's mark, the likelihood of confusion due to the apparent similarity between the two marks, and, underlying all this, Sunny's apparent bad faith in adopting the LOUIS VALENTIN and LOUIS•V marks. Summary judgment in favor of Louis Vuitton is appropriate on the strength of these factors alone. Moreover, other factors, including the degree of similarity between the two marks, the competitive proximity of the products or services, and the likelihood that Louis Vuitton will "bridge the gap," also favor Louis Vuitton. The Court

views the remaining factors as relatively neutral and of lesser consequence to its finding of infringement in light of the strength of the factors above.

Perhaps of greatest importance in finding infringement is the strength of Plaintiff's mark. As courts in this District have recognized, Louis Vuitton clearly has a famous mark, and the strength of that mark "increases the likelihood of consumer confusion." *Virgin Enters. Ltd.*, 335 F.3d at 148; *see, e.g.*, *Louis Vuitton Malletier, S.A. v. Hyundai Motor Am.*, No. 10-CV-1611 (PKC), 2012 WL 1022247, at *7 (S.D.N.Y. Mar. 22, 2012) (finding that Louis Vuitton's marks are "entitled to a high degree of protection"). (Mem. Law Supp. Pl.'s Mot. Partial Summary Judgment ("Pl.'s Mem. Supp. Pl.'s MSJ") (Docket No.48) 16). Defendants argue that, even if Louis Vuitton's mark is generally famous, Plaintiff has not submitted any evidence showing that its mark is strong with regard to sunglasses. Defendants, however, do not cite a single case suggesting that Louis Vuitton must provide such evidence. *Cf. Hyundai Motor Am.*, 2012 WL 1022247 (finding Louis Vuitton's mark to be famous when used in an automobile advertisement even "assuming that the sales volume and public awareness of Louis Vuitton's sports- and auto-related products in the United States are limited to a niche market"). Louis Vuitton has introduced evidence that it is the world's most valuable luxury brand — evidence that Defendants do not contradict — and that eyewear is the company's fastest growing segment. (Pl.'s Rule 56.1 Statement ¶¶ 18, 22). The first *Polaroid* factor therefore weighs heavily in Louis Vuitton's favor.

The degree of similarity between Louis Vuitton's and Sunny's marks, the second factor, also supports a finding of infringement. The overlap between Louis Vuitton's LOUIS VUITTON mark and Sunny's LOUIS VALENTIN mark is obvious. From a technical standpoint, both Louis Vuitton and Louis Valentin begin with the word "Louis," the first and last

letters of the second word in both marks are the same, and both marks feature French-sounding names. Sunny itself has confirmed as much, admitting that the LOUIS VALENTIN brand is "inspired by" Louis Vuitton and that the name was chosen because it is "elegant" and "sound[s] French." (Pl.'s Rule 56.1 Statement ¶ 30; Allan Decl., Ex. 13 at 268:1-17). Indeed, no higher authority than the United States Patent and Trademark Office concluded that LOUIS VUITTON and LOUIS VALENTIN "look and sound very similar, and they convey very similar commercial impressions." (Allan Decl., Ex. 12 at 22). The same is true of the LOUIS VUITTON and LOUIS•V marks. Louis V is a popular nickname for Louis Vuitton products (*see, e.g.*, Pl.'s Mem. Supp. Pl.'s MSJ 17; Pl.'s Rule 56.1 Statement ¶¶ 15-17), and Louis V is a common, popular shorthand for Louis Vuitton, as the latter has been used to refer to the former by such arbiters of popular culture as Pinterest, eBay, Google (Decl. Elizabeth A. McKenzie ("McKenzie Decl.") (Docket No. 55) Ex. 1; Allan Decl., Ex. 15), and Kanye West (Pl.'s Rule 56.1 Statement ¶ 15), among others. Finally, as with the *Polaroid* analysis writ large, courts are directed to analyze the totality of the circumstances in determining the degree of similarity. *See Nabisco*, 220 F.3d at 47 (courts will also "appraise the overall impression created by … the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers.") (internal citations omitted). In doing so here, the Court finds close similarity between LOUIS VUITTON/LOUIS VALENTIN and LOUIS VUITTON/LOUIS•V and finds that the second *Polaroid* factor strongly supports a finding of infringement.

The next, third, factor is the proximity of the products. This factor looks at "whether the two products compete with each other." *La Cibeles, Inc. v. Adipar, LTD.*, No. 99-CV-4129 (AGS), 2000 WL 1253240, at *7 (S.D.N.Y. Sept. 1, 2000) (internal quotation marks omitted). To determine whether two products compete, courts ask "whether the products serve the same

purpose and whether they share similar geographic distribution, market position and audience appeal." *Id.* (internal quotation marks omitted).  Further, they "compare all aspects of the products, including price, style, intended use, target clientele, typical distribution channels, and others." *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F.Supp.2d 305, 316 (S.D.N.Y. 2000).  In undertaking this comparison, "competitive proximity must be measured with reference to the first two *Polaroid* factors," and, accordingly, the obvious strength of Louis Vuitton's mark "demands that it be given broad protection against infringers." *See Mobil Oil*, 818 F.2d at 258. It follows that closely related products, like those at issue here, require less similarity to supporting a finding of trademark infringement.  *Id.* (internal citations omitted).

Sunny's strongest counter-argument is that there is no competitive proximity between its marks and Louis Vuitton's because Sunny's marks are on obviously cheap products which, according to Sunny, distinguishes its goods from the high-end Louis Vuitton products.  (Mem. Law Supp. Defs.' Mot. Partial Summary Judgment ("Defs.' Mem. Supp. Defs.' MSJ") (Docket No. 48) 13-15).  More concretely, Sunny argues that its marks do not compete with Louis Vuitton's by virtue of selling its products at different price points, to different customers, and through different channels of distribution.  Courts have reached different conclusions about whether similar types of products sold at different price points, to different customers, and through different channels of distribution should be considered to be in close proximity. (*Compare Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 874 (2d Cir. 1986) (holding that the fact that designer jeans were likely to be confused with inexpensive jeans because consumers could assume that the designer jeans company "had chosen to enter that market segment using a subsidiary corporation") *with La Cibeles, Inc.*, 2000 WL 1253240, at *8 (finding that two products do not share similar audience appeal where one was sold mainly in

drugstores and the other at "exclusive stores" and where the prices were vastly different)).  In the counterfeiting context, discussed below, courts in this District have made a finding of counterfeiting even where products have differed greatly in price.  *See, e.g., Audemars Piguet Holding S.A. v. Swiss Watch Int'l, Inc.*, No. 12-CV-5423 (HB), 2014 WL 47465 (S.D.N.Y. Jan. 6, 2014) (finding counterfeiting where products differed greatly in price), *rev'd in part on reconsideration*, 2015 WL 150756 (S.D.N.Y. Jan. 12, 2015); *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 109 (2d Cir. 2000).

Even if the Court were inclined to give greater weight to the cases supporting Sunny's "different price points" argument, the close similarity between Louis Vuitton's marks and Sunny's tilts the balance in favor of Louis Vuitton.  The ubiquity of Louis Vuitton coupled with the striking similarity with Sunny's products increases the likelihood of confusion and the corresponding charge that the two products could be in competition.  Although the third factor analysis tends to favor Louis Vuitton, and especially so when considered in conjunction with the first two factors, the Court need not rely heavily on this factor in its overall *Polaroid* analysis.

The Court need not hypothesize about the likelihood of confusion stemming from competitive proximity between Louis Vuitton's marks and Sunny's — or rely entirely on the third factor — because there is documented proof of actual confusion.  A plaintiff need not show actual confusion to recover for trademark infringement.  *See Schutte Bagclosures Inc. v. Kwik Lok Corp.*, No. 12-CV-5541 (JGK), – F.Supp.3d –, 2014 WL 4802917, at *21 (S.D.N.Y. Sept. 29, 2014).  But when a plaintiff can produce such proof, it "is of course convincing evidence that confusion is likely to occur."  *Aceto Agr. Chemicals Corp. v. Bayer Aktiengesellschaft*, 10-CV-1770 (AJN), 2012 WL 3095060, at *9 (S.D.N.Y. July 30, 2012); *see also Morningside Grp. Ltd. v. Morningside Capital Grp., LLC*, 182 F.3d 133, 131 (2d Cir. 1999).  A plaintiff can often show

actual confusion "by way of a well designed consumer survey." *Rush Indus., Inc. v. Garnier LLC*, 496 F.Supp.2d 220, 227 (E.D.N.Y. 2007).  Here, Louis Vuitton has submitted two surveys, one conducted by proposed expert Gerald Ford (the "Ford Survey") and one by proposed expert George Mantis (the "Mantis Survey").[2]  The Ford Survey found a net confusion of sixty-one percent between Louis Vuitton sunglasses and those bearing the LOUIS•V mark in combination with the phrase "PARIS EST. 1941."  (Decl. Steven E. Lauridsen Supp. Defs. Sunny Merchandise Corp. and Chin Zong Tsai's Mot. To Exclude Report, Opinions & Testimony Experts George Mantis & Dr. Gerald Ford ("Lauridsen Mantis/Ford Decl.") (Docket No. 108), Ex. 1 ("Ford Report") at 3).  Similarly, the Mantis Survey found a net twenty-one percent confusion with regard to the LOUIS VALENTIN mark.  (*Id.*, Ex. 3 ("Mantis Report") at 11).  These percentages are well above those that courts in this Circuit have found probative of actual confusion.[3]  *See, e.g., Borghese Trademarks Inc. v. Borghese*, No. 10-CV-5552 (JPO) (AJP), 2013 WL 143807, at *11 (S.D.N.Y. Jan. 14, 2013) (finding a fifteen percent level of net confusion to be sufficient for a jury to conclude that actual confusion exists); *see also RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1061 (2d Cir. 1979) (similar).  Additionally, Louis Vuitton has submitted anecdotal evidence of actual confusion.  (Pl.'s Rule 56.1 Statement ¶¶ 49, 52).  This documented and anecdotal evidence of actual confusion favors a finding of infringement.

---

[2]     Defendants have filed a motion seeking to exclude these two experts.  (Docket No. 106).  As explained below, however, the Court finds their opinions to be admissible.

[3]     Defendants have raised a number of issues with the Ford and Mantis Surveys, including that they used the wrong universe and failed to reflect real-world circumstances.  (Lauridsen Mantis/Ford Decl., Ex. 5).  But even if the Court gives the surveys only minimal weight, the actual confusion factor still favors Louis Vuitton.

The analysis of the next factor — whether Louis Vuitton is likely to bridge the gap — is similar. This factor "turns on the likelihood of whether the senior user will enter the market of the junior user." *Nikon Inc. v. Ikon Corp.*, 987 F.2d 91, 95 (2d Cir. 1993). Louis Vuitton argues that there is no gap to bridge because both companies manufacture sunglasses. (Pl.'s Mem. Supp. Pl.'s MSJ 18-19). And, as with the third factor, Louis Vuitton also asserts that the same type of goods sold at different price points are related goods. (*See id.*). Louis Vuitton's position is supported by case law. *See Audemars*, 2014 WL 47465, at *11; *Nikon*, 987 F.2d at 95. Because the Court finds that Louis Vuitton's marks and Sunny's marks appear on related products, the fifth factor is not of great relevance here.

The opposite is true of the sixth factor. A defendant's good faith — or lack thereof — in adopting its mark is highly consequential among the *Polaroid* factors. *See Mobil Oil*, 818 F.3d at 257. The sixth factor analysis is an equitable inquiry which seeks to answer the overarching question of whether defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill. *See Edison Bros. Stores, Inc. v. Cosmair, Inc.*, 651 F.Supp.1547, 1560 (S.D.N.Y. 1987) (internal citation omitted). Accordingly, where the second-comer has adopted its mark in bad faith, "the equitable balance is tipped significantly in favor of a finding of infringement." *Id.* Courts have found a presumption of likelihood of confusion in such circumstances. *See Paddington Corp. v. Attiki Importers & Distribs., Inc.*, 996 F.2d 577, 586-87 (2d Cir. 1993) ("Where a second-comer acts in bad faith and intentionally copies a trademark … a presumption arises that the copier has succeeded in causing confusion."); *Mobil Oil*, 818 F.3d at 257 ("Intentional copying gives rise to a presumption of likelihood of confusion.").

The Court finds such a presumption appropriate here. The evidence demonstrates that Sunny intentionally attempted to appropriate the ubiquitous LOUIS VUITTON mark through the

use of its confusingly similar LOUIS•V and LOUIS VALENTIN marks.  As recounted above, Sunny has admitted that the LOUIS Valentin brand is "inspired by" Louis Vuitton and that the name was chosen because it is "elegant" and "sound[s] French."  (Pl.'s Rule 56.1 Statement ¶ 30; Allan Decl., Ex. 13 at 152:9, 153:3).  Further, While Sunny has no connection to Paris, several styles of Sunny sunglasses feature the phrase "Paris" or "Paris Est. 1941."  (Pl.'s Rule 56.1 Statement ¶¶ 33, 35-37; Allan Decl., Ex. 13 at 268:1-17).  While these "coincidences" suggest that Sunny's mark intentionally sought to capitalize on Louis Vuitton's goodwill and ubiquity, viewed in the light most charitable to Sunny they are not dispositive.  "There is a considerable difference between an intent to copy and an intent to deceive," and while copying *could* indicate bad faith, the factfinder "is not required to draw that inference where there is evidence to the contrary."  *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 117-18 (2d Cir. 2009).  Even so, "[o]ne who adopts the mark of another for similar goods acts at his own peril and any doubt concerning the similarity of the marks must be resolved against him."  *Am. Home Prods. Corp. v. Johnson Chem. Co.*, 589 F.2d 103, 107 (2d Cir. 1978) (internal citation omitted).

Here, whatever ambiguity exists regarding Sunny's intentions must be considered in light of Sunny's own communications and its seeming proclivity toward infringement; both of which leave little doubt as to Sunny's aims in adopting the LOUIS VALENTIN and LOUIS•V marks.  Louis Vuitton has introduced an e-mail from Stanley Tsai, Sunny's general manager, stating that he was "counting the days until [Sunny] get[s] the letter from LOUIS VUITTON lawyers to make [Sunny] drop [its] trademark."  (Pl.'s Rule 56.1 Statement ¶ 45).  That same e-mail suggested that the longer Sunny could "stay under [Louis Vuitton's] radar" the better, as, given the newness of Sunny's marks, "LOUIS VUITTON will have a good case."  (*Id.*).  Second, Louis Vuitton demonstrates that Sunny is a habitual infringer that has copied not only Louis

Vuitton's marks but also those of several other famous brands, including Gucci, Dior, and Chanel, among other. (Pls.' Mem. Supp. Pl.'s MSJ 14-15; Pl.'s Reply Mem. Defs.' Opp'n Pl.'s Mot. Partial Summary Judgment ("Pl.'s Reply Supp. Pl.'s MSJ") (Docket No. 122) 3). *See Bear USA, Inc. v. A.J. Sheepskin & Leather Outerwear, Inc.*, 909 F.Supp.896, 907 n.17 (S.D.N.Y. 1995) (finding a history of infringement to be relevant to the bad faith analysis). Sunny's history of infringement is not necessary to a finding of intentional misappropriation here, but it contextualizes S. Tsai's email and makes it unlikely that a jury could reach a conclusion other than Sunny intentionally misappropriated the LOUIS VUITTON mark in bad faith. Accordingly, the Court resolves the equitable sixth factor heavily in favor of Louis Vuitton and finds that Sunny's intentional bad faith in adopting the LOUIS VALENTIN and LOUIS•V marks gives rise to a presumption in favor of a likelihood of confusion.

The remaining two factors, the quality of the products and the sophistication of the customers, also tend to favor Louis Vuitton. The seventh factor, the quality of defendants' product, "is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." *Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 398 (2d Cir. 1995); *see also Gameologist Grp., LLC v. Scientific Games Int'l, Inc.,* 838 F.Supp.2d 141, 164 (S.D.N.Y. 2011). There is no dispute that Sunny's products are of an inferior quality to Louis Vuitton's, and, as with regard to the seventh factor, the Court accepts Louis Vuitton's parallel argument with respect to confusion in the post-sale context as well. Therefore this seventh factor also favors Louis Vuitton, although the Court does not rely heavily on it in the overall *Polaroid* analysis.

The final factor examines the sophistication of the purchasers. As several courts have noted, purchasers of Louis Vuitton products "tend to be sophisticated and discerning," *Malletier*

*v. Burlington Coat Factory Warehouse Corp.*, No. 04-CV-2644 (RMB), 2006 WL 1424381, at

*8 (S.D.N.Y. May 23, 2006), *aff'd and remanded*, No. 06-CV-2540, 217 Fed.Appx. 1 (2d Cir.

2007); *see also Louis Vuitton Malletier v. Dooney & Bourke*, 340 F.Supp.2d 415, 446 (S.D.N.Y.

2004) *vacated in part on other grounds by* 454 F.3d 106 (2d Cir. 2006).   The prototypical Louis

Vuitton purchaser could therefore be expected to be able to distinguish between Sunny's and

Louis Vuitton's products.   However, as discussed above, the Court need not engage in such a

hypothetical exercise because there is a high degree of documented actual confusion between

Sunny's marks and Louis Vuitton's.   This existence of actual confusion, the fourth *Polaroid*

factor, adds credence to Louis Vuitton's theory of post-sale confusion, suggesting that

individuals other than the purchaser are relevant to the infringement analysis.   *See Louis Vuitton*

*Malletier S.A. v. LY USA, Inc.*, 472 Fed.Appx. 19, 21 (2d Cir. 2012).   (Pl.'s Mem. Supp. Pl.'s

MSJ 20-21).   The potential for both initial purchase and post-sale confusion tends to favor a

finding of infringement.   Consequently, this factor also favors Louis Vuitton though, like the

seventh factor, it does not weigh heavily here in the overall *Polaroid* analysis.

Having completed the *Polaroid* analysis, the Court finds that Louis Vuitton's motion for

summary judgment on its infringement claims must be granted.[4]   In reaching this conclusion, the

Court places particular emphasis on the strength of Louis Vuitton's LOUIS VUITTON mark and

the high degree of similarity among the LOUIS VUITTON mark and Sunny's LOUIS•V and

LOUIS VALENTIN marks, in conjunction with Sunny's apparent bad faith in attempting to

---

[4]      Plaintiff also argues that "Sunny has sold sunglasses featuring exact copies of Louis
Vuitton's Daimler Mark" and "close copies of the Louis Vuitton Flower Marks." (Pl.'s Mem.
Supp. Pl.'s MSJ 21).   Because Louis Vuitton has acknowledged that its state law claims are
"governed by essentially the same standard as its infringement claim," summary judgment is also
granted on those claims. *See Mobil Oil Corp.*, 818 F.2d at 260.   (Pl.'s Mem. Supp. Pl.'s MSJ 22
n.10).

misappropriate the goodwill of the famous LOUIS VUITTON.  These findings raise a

presumption of likelihood of confusion that has been borne out by Louis Vuitton's offering proof

of actual confusion among the marks and further bolster the finding that there is "gap to bridge"

because the products are so similar.  Although the superior quality of Louis Vuitton's products

and the sophistication its customers also tend to favor Louis Vuitton, the Court need not rely on

those factors due to how heavily the other factors weigh in Louis Vuitton's favor.  Accordingly,

the Court grants Louis Vuitton's motion for summary judgment on its infringement claims.

### 2.      *Cross-Motions for Summary Judgment on Counterfeiting*

Both Plaintiff and Defendants have moved for summary judgment on Plaintiff's

counterfeiting claims with regard to the LV and Flower marks.  (Pl.'s Mem. Supp. Pl.'s MSJ 22-

24; Defs.' Mem. Supp. Defs.' MSJ 8-24).[5]  Under the Lanham Act, a counterfeit mark is a

"spurious mark which is identical with, or substantially indistinguishable from, a registered

mark."  15 U.S.C. § 1127.   To be substantially indistinguishable, two marks must be "nearly

identical . . . with only minor differences which would not be apparent to an unwary observer."

*Consol. Cigar Corp. v. Monte Cristi de Tabacos*, 58 F.Supp.2d 188, 196 (S.D.N.Y. 1992).  If

that standard is met, "the Court need not undertake a factor-by-factor analysis under *Polaroid*

because counterfeits, by their very nature, cause confusion."  *Coach, Inc. v. Horizon Trading*

*USA Inc.*, 908 F.Supp.2d 426, 433 (S.D.N.Y. 2012) (international quotation marks omitted).

Defendants argue that the difference in quality between its products and Louis Vuitton's

are dispositive.  (Defs.' Mem. Supp. Defs.' MSJ 13-15).  Defendants rely heavily on *Gucci*

---

[5]      Louis Vuitton concedes that the Daimler and Rounder Flower Marks are not a counterfeit
mark under the Lanham Act.)  (Mem. Law Opp'n Defs.' Mot. Partial Summary Judgment ("Pl.'s
Mem. Opp'n Defs.' MSJ") (Docket No. 82) 6 n.6).  Defendants' motion for partial summary
judgment is therefore granted to the extent the Complaint can be read to assert any such claim.

*America, Inc. v. Guess?, Inc.*, 868 F.Supp.2d 207, 242, 253 (S.D.N.Y. 2012), which stated that "courts have uniformly restricted trademark counterfeiting claims to those situations where entire products have been copied stitch-for-stitch." (Defs.' Mem. Supp. Defs.' MSJ 11, 13; Defs.' Reply Mem. Supp. Their Mot. Partial Summary Judgment ("Defs' Reply Supp. Defs.' MSJ") (Docket No. 114) 1-4). But even assuming that the *Guess?* Court intended to hold that entire products must be counterfeit (which is far from clear), the Court provided no citation for that proposition, which runs counter to the plain text of the *Lanham* act.[6] *See* 15 U.S.C. § 1127 ("A 'counterfeit' is a spurious mark which is identical with, or substantially indistinguishable from, a registered mark."). Further, as Plaintiff points out in its memorandum of law, several courts in this Circuit have found products to be counterfeit even if they were of inferior quality to the original. *See, e.g.*, *Coach, Inc. v. Zhen Zhen Weng*, No. 13-CV-445, 2014 WL 2604032 (S.D.N.Y. Jun 9, 2014); *see also Gucci Am., Inc. v. MyReplicaHandbag.com*, No. 07-CV-2438 (JGK), 2008 WL 512789, at *1 (S.D.N.Y. Feb. 26, 2008) (finding that the defendants "manufacture, distribute and sell counterfeit Gucci, Chloe and Dunhill goods" where the products "use the same color schemes, patterns and designs as the plaintiffs' products, but are inferior in quality and workmanship"). This makes good sense. One of the main purposes of

---

[6] Defendants also rely on *Louis Vuitton Malletier S.A. v. Haute Diggity Dog., LLC*, 507 F.3d 252 (4th Cir. 2007). That case, however, has little bearing on the one at hand. *Haute Diggity Dog* involved the question whether "Chewy Vuitton" dog toys bearing "Chewy Vuitton" and "CV" marks were counterfeits. The Court's conclusion that they were not hinged not only on the fact that the products were different but also on the differences between the marks themselves. *Id.* at 269. Further, even if the Court had relied solely on the distinctions between the products, the case at issue here would be distinguishable. There is a significant difference between selling dog toys — which (1) Louis Vuitton does not sell and (2) were intended as a parody — and selling cheap sunglasses. Unlike in this case, the two products in *Haute Diggity Dog* were different in *kind*, not just quality. *See id.* ("In selling 'Chewy Vuitton' dog toys, Haute Diggity Dog is not selling knock-off LOUIS VUITTON handbags with a counterfeit LV mark, and no reasonable trier of fact could so conclude.").

federal trademark law is to protect "the businessman's right to enjoy business earned through investment in the good will and reputation attached to a trade name." *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 215 (2d Cir. 2012) (internal quotation marks omitted). Sunny argues that someone purchasing Sunny's glasses would not believe them to be genuine Louis Vuitton, but the same does not necessarily hold true in the post-sale context. If an observer sees a mark that he believes to be Louis Vuitton's on a pair of sunglasses, "it is likely that the observer would identify the [sunglasses] with the plaintiff, and the plaintiff's reputation would suffer damage if the [sunglasses] appeared to be of poor quality." *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 146, 148 (4th Cir. 1987). Consequently, the mere fact that Louis Vuitton's products are of significantly higher quality than Sunny's is not sufficient to entitle Defendants to judgment as a matter of law on Louis Vuitton's counterfeiting claims.

Next, Defendants point to a number of differences between the symbols they use and Louis Vuitton's LV and Flower marks. For example, Louis Vuitton believes that Sunny's overlapping VF Design[7] — which Sunny claims stands for Visual Fantasy (Defs.' Rule 56.1 Statement ¶ 29) — is a counterfeit of its overlapping LV mark. (Compl. ¶ 30). An F, however, is obviously not the same letter as a V. (Defs.' Mem. Supp. Defs.' MSJ 15-18). *Cf. Montres Rolex, S.A. v. Snyder*, 718 F.2d 524, 531 (2d Cir. 1983) (stating that it is "doubtful" that "the average purchaser" would have viewed an overlapping PV mark as "substantially indistinguishable" from Louis Vuitton's overlapping LV mark). Similarly, Defendants point out that all three of Louis Vuitton's Flower marks contain four petals, while several of Sunny's flower designs have five or six. (Defs. Rule 56.1 Statement 1-2; Defs.' Mem. Supp. Defs.' MSJ

---

[7]     For ease of reference, the Court will refer to both Sunny's and Louis Vuitton's designs by the names used in Defendants' Rule 56.1 Statement.

18-19). And with regard to Louis Vuitton Pointed Flower Mark specifically, Louis Vuitton's petals are of a slightly different shape than those featured on Sunny's Pointed Flower, and the circle at the center of Louis Vuitton's mark is larger than that at the center of Sunny's. (Defs.' Rule 56.1 Statement 1-2; Defs.' Mem. Supp. Defs.' MSJ 19). Finally, with regard to Louis Vuitton's Diamond Flower Mark, Louis Vuitton's registered mark has a circle in the center, and Sunny's allegedly counterfeit Diamond figure does not. (Defs.' Rule 56.1 Statement 1-2; Defs.' Mem. Supp. Defs.' MSJ 20).

Louis Vuitton argues that these differences are so small as to be "legally irrelevant." (Pl.'s Mem. Supp. Pl.'s MSJ 23). Courts in this Circuit have found a mark to be counterfeit even if it has "minor differences" from the original, *Consol. Cigar Corp.*, 58 F.Supp.2d at 196, including incorporating different letters from the original mark, *see Coach, Inc. v. Horizon Trading USA Inc.*, 908 F.Supp.2d 426, 433-34 (S.D.N.Y. 2012) (finding GC mark to be counterfeit of Coach's CC mark). (Pl.'s Mem. Opp'n Defs.' MSJ 5). The Court, therefore, agrees with Louis Vuitton that Sunny's marks are not sufficiently different from Louis Vuitton's for Defendants' to be entitled to judgment as a matter of law: while the differences may be apparent upon close inspection, they would not necessarily be obvious to the average purchaser. *See Montres Rolex, S.A.*, 718 F.2d at 532 (whether a mark is counterfeit is to be considered from the perspective of the average consumer, not an expert). For example, while Sunny's VF symbol uses a different letter from Louis Vuitton's LV mark, the F is styled in such a way that it could easily be mistaken for a V. (*See* Defs.' Rule 56.1 Statement 1). Nonetheless, the differences that Sunny points out between its marks and Louis Vuitton's are significant enough that it would not be unreasonable for a trier of fact to conclude that they *are* distinguishable. Accordingly, the

Court denies both Louis Vuitton's and Defendants' motions for summary judgment on the counterfeiting claims.[8]

### 3.    *Defendants' Motion for Summary Judgment on All Claims Against Gene Tsai*

In addition to suing Sunny, Louis Vuitton is seeking to hold Gene Tsai, Sunny's president and founder, personally liable.  A corporate officer is liable for trademark infringement if he "directs, controls, ratifies, participates in, or is the moving force behind the infringing activity." *ABC Rug & Carpet Cleaning Serv., Inc. v. ABC Rug Cleaners, Inc.*, No. 08 Civ. 5737 (RMB) (RLE), 2010 WL 10091076, at *13 (S.D.N.Y Feb. 10, 2010) (internal quotation marks omitted). Courts have found an employee to be the "moving force" behind a Lanham Act violation when he was primarily responsible for designing, marketing and developing an infringing product, *Merk Eprova AG v. Brookstone Pharm., LLC*, 920 F.Supp.2d 404, 427 (S.D.N.Y. 2013), or otherwise "directly participated" in the violation, *Ramada Franchise Sys., Inc. v. Boychuk*, 283 F.Supp.2d 777, 788 (S.D.N.Y. 2003).

Defendants argue that that standard is not met here because Tsai "has not been involved in the operations of the company" since his 2003 heart attack and subsequent stroke.  (Defs.' Mem. Supp. Defs.' MSJ 3; Defs. Rule 56.1 Statement ¶¶ 6-7).  *See Ramada Franchise Sys., Inc.*, 283 F.Supp.2d at 788 (finding that the defendant was not personally liable for violating the Lanham Act because "he was not involved in the day-to-day decisionmaking process or operations" of the company).  Both Stanley and Gene Tsai, for example, stated in their depositions that Gene Tsai's role in the company after his heart attack was minimal.  (*See, e.g.,*

---

[8]    Because the Court finds that Louis Vuitton is not entitled to summary judgment on its Lanham Act claims, it need not address Defendants' laches and acquiescence arguments. (*See* Defs.' Replacement Mem. Law Opp'n Pl.'s Mot. Partial Summary Judgment ("Defs.' Mem. Opp'n Pl.'s MSJ") (Docket No. 112) 9-12).

Lauridsen Decl. Supp. Defs.' MSJ, Ex. 7, at 21:14 (stating that Gene Tsai's role was "very limited"); Ex. 8 at 10:22-23 (stating that, after his heart attack, Gene Tsai "did not get involved or manage the work anymore")).  While Gene Tsai is Sunny's president, both Stanley and Gene Tsai maintain that the title was merely an honorific.  (*See, e.g.*, Lauridsen Decl. Supp. Defs.' MSJ, Ex. 8 at 79:25-80:11 (stating that Tsai is president "in name only"); Decl. Stanley Tsai Supp. Mot. Summary Judgment ("Stanley Tsai Decl.") (Docket No. 73) ¶ 9).  Further, two employees stated at their depositions that Gene Tsai was generally absent from Sunny's offices (Defs.' Rule 56.1 Statement ¶ 13), and not one of Sunny's customers said that he or she had heard of or communicated with him (Defs.' Rule 56.1 Statement ¶ 14).

On the other hand, Louis Vuitton maintains that Gene Tsai was actively involved in the business.  It notes that, until 2012 (nine years after Gene Tsai's heart attack), Sunny was the company's sole shareholder, and he is still the company's president.  (Pl.'s Rule 56.1 Statement ¶¶ 88-89).  He also receives over rent from Sunny, which occupies a building that Tsai owns, despite the absence of a lease agreement.  (Pl.'s Rule 56.1 Statement ¶ 87).  As president, Gene Tsai's formal responsibilities included "general supervision, direction and control of the business."  (Pl.'s Rule 56.1 Statement ¶ 90).  Further, Gene Tsai has attended Sunny's board meetings, including some that were held at his home, and he signed Sunny's tax returns until 2013.  (Pl.'s Rule 56.1 Statement ¶¶ 91-92).  Louis Vuitton also fixates on the fact that Gene Tsai was the only Sunny witness with any knowledge of the VF logo (Pl.'s Rule 56.1 Statement ¶¶ 70-74), in addition to being the person who incorporated Visual Fantasy, Inc., a California corporation that was dissolved in 1991 (Pl.'s Rule 56.1 Statement ¶ 75).

None of Louis Vuitton's evidence, however, creates a *genuine* question of material fact as to Gene Tsai's role in the company.  Louis Vuitton's reliance on Tsai's knowledge of the VF

Logo, for example, is misplaced.  While Gene Tsai stated that the company uses the VF logo, he also said that he was not involved "in the process of working with the factory on a VF configuration" and that he believed that the sunglasses were designed by the company's manager or the factory.  (Decl. Steven E. Lauridsen Opp'n Pl.'s Mot. Partial Summary Judgment ("Lauridsen Decl. Opp'n Pl.'s MSJ") (Docket No. 91), Ex. 1 at 51:8-12, 68:20-21).  The fact that Louis Vuitton did not depose anyone who said he or she was involved with the design of the sunglasses does not transform Gene Tsai into the "moving force" behind them.  Further, while Gene Tsai was present at board meetings, Louis Vuitton has not introduced any evidence that specific products or intellectual property issues were ever discussed at the meetings, let alone that Tsai took an active part in them.  (*See* Decl. Chin Zong Tsai *a/k/a* Gene Tsai Supp. Mot. Summary Judgment ("Gene Tsai Decl.") (Docket No. 57) ¶ 10; *see also* Sunny Tsai Decl. ¶ 10). Louis Vuitton, then, is left almost entirely with Gene Tsai's formal role at the company.  But the fact that Gene Tsai appeared on paper to have general oversight of the company and that he signed certain legal documents is hardly sufficient to show that he was directly involved in Sunny's alleged infringement.  *See Kuklachev v. Gelfman*, No. 08-CV-2214 (CPS) (VVP), 2009 WL 804095, at *5 (E.D.N.Y. Mar. 25, 2009) (holding that an allegation only that "defendants held certain titles" but not that they "authorized or approved any allegedly infringing actions" is insufficient to demonstrate the officers should be personally liable); *cf. Peaceable Planet, Inc. v. Ty, Inc.*, 362 F.3d 986, 994 (7th Cir. 2004) ("[U]nless a shareholder—sole, controlling, or otherwise—is shown to have been personally involved in the commission of the tort by his corporation, he is not jointly liable for the tort.").  Consequently, the Court finds that Defendants are entitled to summary judgment with regard to the claims against Gene Tsai.

### 4.   *Non-Daubert Evidentiary Objections*

Both Plaintiff and Defendants have asked the Court to strike portions of the other's Rule 56.1 statements.  Louis Vuitton argues that Defendants' "Additional Responsive Facts" in their response to its Rule 56.1 statement violate Local Rule 56.1(d).  (Louis Vuitton's Responses Defs.' Additional Responsive Facts ("Pl.'s Response Defs.' Additional Facts") (Docket No. 123) 1-2).  Because the Court did not rely on the Additional Responsive Facts, Louis Vuitton's motion to strike is denied as moot.

Defendants have lodged a long list of objections to Louis Vuitton's evidence.  (Defs.' Evidentiary Objections Opp'n Pl.'s Mot. Partial Summary Judgment ("Defs.' Ev. Objections") (Docket No. 89)).  As an initial matter, Defendants' objections to evidence on which the Court did not rely (including, but not limited to, its objections to the Klug Declaration, Paragraph 7 of the Hamilton Declaration, and Exhibit 10 to the Allan Declaration) are denied as moot.  Its other non-*Daubert* objections are also denied, without prejudice to renewal at trial.  Many of Defendants' objections, for example, relate to evidence of the strength of Louis Vuitton's brand in general — rather than its strength with regard to sunglasses in particular — as irrelevant and prejudicial.  (*See, e.g.*, Defs.' Ev. Objections 2 (objection to Hamilton Decl. paragraphs 3-6, and 8-10), 3 (objection to Allan Decl. Ex. 6)).  As explained above, however, that evidence is plainly relevant to Plaintiff's trademark claims.  Defendants also object to the introduction of Louis Vuitton and third-party advertisements, internet search results, and various articles and reports on the basis that they are hearsay.  (*See, e.g.*, Defs.' Evidentiary Objections 5 (objections to McKenzie Decl. Exs. 1-8)).  These documents, however, are not being used for the truth of the matter asserted and therefore are not hearsay.  The Court has also considered Defendants' other objections and finds them to be similarly meritless.

**B.**     **Defendants' Motions To Preclude Plaintiff's Proposed Experts' Testimony**

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides, in relevant part as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>>
>> (b) the testimony is based on sufficient facts or data;
>>
>> (c) the testimony is the product of reliable principles and methods; and
>>
>> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993), the United States Supreme Court defined the "gatekeeping role" of the district courts with respect to expert testimony, declaring that "the Rules of Evidence especially Rule 702—[ ] assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  A trial court should therefore admit expert testimony only where it is offered by a qualified expert and is relevant and reliable.  *See generally id.* at 587-90; *see also Nosal v. Granite Park LLC*, 269 F.R.D. 284, 286 (S.D.N.Y. 2010).  The Rule 702 inquiry, however, "is a flexible one," *Daubert*, 509 U.S. at 594, and a "liberal standard of admissibility" ought to be employed, *Nimely v. City of N.Y.*, 414 F.3d 381, 395-96 (2d Cir. 2005); *see also Nosal*, 269 F.R.D. at 287.

The focus of a court's reliability inquiry "must be solely on principles and methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 595. In *Daubert*, the Supreme Court listed four factors to guide district courts in assessing the reliability of expert testimony: (1) whether the expert's technique or theory can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) its known or potential rate of error; and (4) whether the theory or technique is generally accepted by the relevant scientific community. *Id.* at 593-94. Yet given the "flexible" nature of the Rule 702 admissibility inquiry, *id.* at 594, "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the case, the expert's particular expertise, and the subject of his testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). In other words, "whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id.* at 153.

Defendants have filed three separate motions to exclude the testimony and reports of Louis Vuitton's proposed experts — Carla Mulhern (Docket No. 99), Seth Matlins (Docket No. 103), George Mantis (Docket No. 106), and Dr. Gerald Ford (together with Mantis, the "Survey Experts"). Based on the above principles, the Court will address each in turn.[9]

---

[9] To the extent that Defendants move to strike Mulhern's and Matlins's reports (Decl. Steven E. Lauridsen Supp. Defs. Sunny Merchandise Corp. & Chin Zong Tsai's Mot. To Exclude Report, Opinions & Testimony Expert Carla S. Mulhern ("Lauridsen Mulhern Decl.") (Docket No. 102), Ex. 1 (the "Mulhern Report"); Decl. Steven E. Lauridsen Supp. Defs. Sunny Merchandise Corp. & Chin Zong Tsai's Mot. To Exclude Report, Opinions & Testimony Expert Seth Matlins ("Lauridsen Matlins Decl.") (Docket No. 105), Ex. 1 ("Matlins Report")), the motions are effectively moot as the Court did not rely on the reports in reaching its conclusions on the motions for summary judgment. But, insofar as the case will now proceed to trial (absent settlement), the portions of the motions seeking to preclude Mulhern and Matlin from testifying are not moot.

### 1. *Motion to Exclude Proposed Expert Carla Mulhern*

Defendants seek to exclude the testimony of Carla Mulhern, an economist, on the grounds that: (1) the majority of the report consists of "[s]imple addition [that] is well within the capabilities of the jury"; (2) she "makes a series of unsupported conclusions" concerning Louis Vuitton's damages; (3) her analysis is not within the scope of a post-sale environment; and (4) her report does not cover the relevant time period.  (Mem. Law Supp. Defs. Sunny Merchandise Corp. & Chin Zong Tsai's Mot. To Exclude Expert Report & Testimony Carla S. Mulhern ("Defs.' Mulhern Mem.") (Docket No. 100) 2-7).  All of Defendants' objections are meritless.

First, Defendants object to the inclusion of several excel spreadsheets created by Mulhern and her associates that reflect Sunny's revenues, cost margins, and profits (Mulhern Report, Exs. 2-9) on the grounds that she simply took data produced by Sunny and reformatted it.  (Defs.' Mulhern Mem. 2-3).  Because Mulhern did nothing more than "simply add up" figures provided to her by Sunny, Defendants argue, the tables should be excluded as involving "'lay matters which [the trier of fact] is capable of understanding and deciding without the expert's help.'" (Defs.' Mulhern Mem. 2 (quoting *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989)).  But Mulhern did more than simply add a few numbers — she combed through at least 100 pages of sales reports, compiled and aggregated the data (which was provided on a transaction-by-transaction basis), and presented it in a more readily understandable format. (Allan Decl., Ex. 1 at 83:5-6, 52:15-53:13; Lauridsen Mulhern Decl., Ex. 2 at 65:16-66:9).  Her spreadsheets are therefore "summaries of the contents of voluminous data [which] will streamline the presentation of that data to the jury, saving the jury time and avoiding unnecessary confusion." *See Gill v. Arab Bank, PLC*, 893 F.Supp.2d 523, 536 (E.D.N.Y. 2012); *see also Iacobelli Constr., Inc. v. Cnty. of Monroe*, 32 F.3d 19, 25 (2d Cir. 1994) ("Given the inherently

voluminous and highly technical nature of the data in such cases, the parties in a construction-contract dispute usually must retain experts to summarize and interpret that data."). Accordingly, they are admissible.

Defendants' second argument is equally unconvincing.  Defendants seek to exclude Mulhern's conclusions about the effect of Sunny's sales on Louis Vuitton's brand value as "subjective belief or unsupported speculation" (Defs.' Mulhern Mem. 5 (quoting *Daubert*, 509 U.S. at 590)) because she relied on articles about brand value and deposition testimony without performing any analysis of her own.  (Defs. Mulhern Mem. 4-5).  Such sources, however, are clearly within the universe of those on which Mulhern could permissibly rely.  *See, e.g.*, *U.S. Info. Sys., Inc. v. Int'l Bhd. Elec. Workers Local Union No. 3*, 313 F.Supp.2d 213, 236-37 (S.D.N.Y. 2004) (allowing expert testimony that relied heavily on deposition testimony).  Further, that Mulhern's testimony is qualitative, rather than quantitative, does not mean that it must be excluded.  Mulhern's reasoning "is based principally upon [her] experience and research in the world of [economics], which qualify [her] to opine on such matters."  *Beastie Boys v. Monster Energy Co.*, 983 F.Supp.2d 354, 364-65 (S.D.N.Y. 2014).  As the Court explained in a case similarly rejecting a challenge to expert testimony on brand erosion, "'[t]echnical . . . or other specialized knowledge' may be relevant and reliable, and therefore admissible under *Daubert*, even if the field of knowledge, be it marketing or plumbing, does not readily lend itself to a formal or quantitative methodology."  *Id.*

Defendants' next objection — that the report does not reveal anything about a post-sale environment — is beside the point.  First, Louis Vuitton has not limited its claims to those involving post-sale confusion.  (Louis Vuitton's Opp'n Defs.' Mots. To Exclude Expert Reports & Testimony Carla Mulhern, Seth Matlins, Dr. Gerald Ford & George Mantis ("Pl.'s Expert

Mem.") (Docket No. 128) 6). Second, it is unclear why a calculation of profits of sales of infringing merchandise would differ based on a plaintiff's decision to pursue a post-sale theory of liability. To the extent that Defendants' believe Mulhern's conclusions do not hold in the post-sale context, their objections "may be properly explored on cross-examination and go to [the] testimony's weight and credibility — not its admissibility." *Int'l Bus. Machs. Corp. v. BCG Partners, Inc.*, No. 10 Civ. 128 (PAC), 2013 WL 1775437, at *16 (S.D.N.Y. Apr. 25, 2013) (alteration and internal quotation marks omitted); *see also Bacardi & Co. v. N.Y. Lighter Co., Inc.*, No. 97–CV–7140 JS VVP, 2000 WL 298915, at *2 (E .D.N.Y. Mar. 15, 2000) ("Although expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." (internal quotation marks omitted)).

The same is true with regard to Defendants' final objection, that Mulhern considered the wrong time period. If Defendants believe that Mulhern's report is over-inclusive, they may question her about it at trial. And, in any event, the objection is premature. Defendants believe that Louis Vuitton cannot recover damages or profits unless (1) Sunny had actual notice of Louis Vuitton's trademark registrations or (2) Louis Vuitton complied with the constructive notice requirements of the Lanham Act. (Defs.' Expert Mem. 6). That is a legal question, however, with which the Court has not been properly presented. The Court therefore declines to resolve it in the context of a motion to exclude expert testimony. Further, even if the Court were to accept Defendants' legal argument, whether Sunny had actual notice of Louis Vuitton's trademark registrations is a question of fact that is properly left for trial.

Lastly, although Defendants do not challenge Mulhern's qualifications, the Court finds that she is undoubtedly qualified. Mulhern, who specializes in intellectual property valuation and damages assessments, has both an M.Sc. in economics from the London School of Economics and Political Science, and a B.S. in mathematics from Bucknell University. (Mulhern Report 2, App. A; *see also* Decl. Michael J. Allan Supp. Louis Vuitton's Opp'n Defs.' Mots. To Exclude Expert Reports & Testimony Carla Mulhern, Seth Matlins, Dr. Gerald Ford & George Mantis ("Allan Expert Decl.") (Docket No. 129), Ex. 1 at 13:14-17). She has also worked in the "intellectual property damages area" for around twenty to twenty-five years, including testifying in at least three other trademark cases and numerous patent cases. (Allan Expert Decl., Ex. 1 at 19:1, 19:10-19:13; Mulhern Report 2, App. A).

### 2.    *Motion To Exclude Proposed Expert Seth Matlins*

Defendants' seek to exclude Plaintiff's proposed marketing expert, Seth Matlins, on the grounds that he (1) is not qualified (Mem. Law Defs. Sunny Merchandise Corp. & Chin Zong Tsai's Mot. To Exclude Report, Opinions, & Testimony Pl.'s Expert Seth Matlins ("Defs' Matlins Mem.") (Docket No. 104) 2-3); (2) cited only documents that "can be readily understood by the layperson" (*Id.* at 3-8); (3) failed to apply any "specialized knowledge or methodology" (*Id.* at 8-9); and (4) improperly opined on an ultimate issue (*Id.* at 9-10). For the reasons explained below, Defendants' motion is granted in part and denied in part.

First, Matlins is qualified to testify as a marketing expert. Defendants criticize Matlins for his supposed lack of relevant formal educational training, but "[t]he Second Circuit has taken a liberal view of the qualification requirements of Rule 702, at least to the extent that a lack of formal training does not necessarily disqualify an expert from testifying if he or she has equivalent relevant practical experience." *In re Rezulin Prods. Liab. Litig.*, 309 F.Supp.2d 531,

559 (S.D.N.Y. 2004); *see also Peerless Ins. Co. v. Marley Engineered Prods. LLC*, No. CV 05–4848 (AKT), 2008 WL 7440158, at *2 (E.D.N.Y. June 12, 2008) ("This Circuit has adopted a liberal standard for qualifying an expert and there is no requirement that a witness have formal education or training before being qualified as an expert." (citing *Nimely v. City of N.Y.*, 414 F.3d 381, 396 (2d Cir. 2005))). "If an expert's training and experience is in a field closely related to the area of the proposed testimony, that may — in appropriate circumstances — be sufficient to meet Rule 702's qualification standards." *SEC v. Tourre*, 950 F.Supp.2d 666, 674 (S.D.N.Y. 2013). Here, Matlins's marketing and branding experience is sufficient to qualify him as an expert on branding. (Pl.'s Expert Mem. 14). For more than two decades, he has "worked at the highest levels of the branding and marketing business," and has been involved with "dozens of brands and hundreds of 'deals' from their conception, planning, negotiation, and the execution of transactions." (Matlins Report at 1). He has not only "worked for, with, and represented" some of the most recognizable brands operating today, including Apple, BMW, and Coca-Cola, but also "conceived, developed, and launched" his own brands. (*Id.* at 2). He therefore has ample "experience . . . in a field closely related to the area of [his] proposed testimony."

The Court also rejects Defendants' second two arguments — that Matlins relied only on easily understood sources and did not perform any expert analysis — largely for the same reasons that it rejected Defendants' similar argument with regard to the Mulhern Report. While a juror may be able to understand each individual source that Matlins cites, Matlins "synthesizes this material and pulls together common themes in reaching his conclusions." *Linde v. Arab Bank, PLC*, 922 F.Supp.2d 316, 332 (E.D.N.Y. 2013) (allowing expert to testify even though "his research was conducted solely on the Internet"); *see Broadspring, Inc. v. Congoo, LLC*, No. 13-CV-1866 (JMF), 2014 WL 4100615, at *16 (S.D.N.Y. Aug. 20, 2014) (allowing an expert to

testify who had "relied on his specialized knowledge in the field of information security to synthesize information from his diverse sources and to form an opinion"); *cf. Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 135-36 (2d Cir. 2013) (noting that a historian would be permitted to "helpfully synthesize dense or voluminous historical texts" or "offer background knowledge or context that illuminates or places in perspective past events"). Similarly, the Court rejects the notion that Matlins did not offer any expert analysis. As explained with regard to the Mulhern Report, that an analysis may be qualitative does not mean that it is unreliable for the purposes of *Daubert*. *See also Alfa Corp. v. OAO Alfa Bank*, 475 F.Supp.2d 357, 366 (S.D.N.Y 2007) (admitting testimony based on an expert's experience in the industry, internet research, and the parties' annual reports in part because the expert was "not offering testimony, such as a damages calculation, that would require a comprehensive market survey or other quantitative data").

Unlike Defendants' first two objections, their last objection does have merit. Although Louis Vuitton is correct that expert testimony is generally "not objectionable on the grounds that it embraces an ultimate issue in the case," 29 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure*, § 6284 (1997), an expert may neither "be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence," *In re Fosamax Products Liab. Litig.*, 645 F.Supp.2d 164, 192 (S.D.N.Y. 2009), nor "attribut[e] subjective motivations to the parties," *Aventis Envtl. Sci. USA LP v. Scotts Co.*, 383 F.Supp.2d 488, 516 (S.D.N.Y. 2005). Parts of Matlins's report do both. For example, Matlins gives a long overview of Sunny's business model and history (Matlins Report at 25-28) that does little more than summarize evidence in the record in order to construct a narrative. Further, at several points Mantis attributes the intent to copy Louis Vuitton to Sunny. For example, he states "[g]iven the power of Louis Vuitton and its trademarks, [Sunny's] efforts seem to have been done

intentionally to mislead and confuse consumers." (*Id.* at 29; *see also, e.g., id.* at 30 (stating that Sunny was engaged in a "clear attempt at exploiting consumer awareness of Louis Vuitton"), 34 (stating that Sunny employed "a deliberate strategy" to "piggy-back" on Louis Vuitton's goodwill)). It is well established, however, that "[d]etermining what motivated a particular person or entity is generally not an appropriate subject matter for expert testimony." *R.F.M.A.S., Inc. v. So*, 748 F.Supp.2d 244, 268 (S.D.N.Y. 2010). Accordingly, while Matlins may properly explain why Sunny's actions would be consistent with intentional copying or why such copying would be profitable (if that is indeed the case), he may not testify that Sunny actually employed such a strategy. Further, any testimony that simply regurgitates evidence already in the record in narrative form (such as Sunny's and Louis Vuitton's respective histories) is similarly excluded.

### 3.   *Motion to Exclude Proposed Experts George Mantis and Gerald Ford*

Defendants also seeks to exclude Plaintiff's proposed Survey Experts, arguing that: (1) neither survey examined the proper universe; (2) the sample sizes were too small; (3) allowing the subjects to view the survey stimuli while responding to questions was inappropriate; (4) the surveys did not replicate real-world conditions; (5) the controls were inadequate; (6) Ford's controls were not visible; and (7) Ford's survey involved only two products out of 400. Defendants' specific objections to the Ford survey are easily dealt with. Defendants claim (without any citation to the record) that, despite Ford's statement under penalty of perjury that the images in his report accurately represent the cells as displayed in the survey, "[t]he truth is that both of the control cells . . . were significantly smaller than the test cells." (Mem. Law Supp. Defs. Sunny Merchandise Corp. & Chin Zong Tsai's Mot. To Exclude Reports, Opinions, & Testimony Pl.'s Experts George Mantis & Dr. Gerald Ford ("Defs.' Ford/Mantis Mem.") (Docket No. 107) 9). The main evidence that Defendants' present that the control in Ford's

survey was not visible was that one person (out of 411) stated that he could not see it. (Lauridsen Ford/Mantis Decl., Ex. 2 at 170:25-171:1; *Id.*, Ex. 1 ("Ford Report") at 2). One comment, however, is insufficient to demonstrate that there was a problem with the control so severe as to warrant exclusion. Further, while the some of the images of the control in the Ford Report are small, the screen contained instructions to click to enlarge (Ford Report, App. B at B16-29), and to stay in the study, respondents had to affirm that they could see the sunglasses (Ford Report 11). Also, the fact that Ford's survey tested only two products is not sufficient to preclude his testimony. As Louis Vuitton points out in its memorandum of law, the Ford study was designed to test the marks, not the frames, and it would have been nearly impossible to design a study including all 400 products. (Pl.'s Expert Mem. 27-28). Of course, Defendants are welcome to argue that the fact that the study involved only two products limits the significance of its findings, but that is exactly the type of inquiry that "may be properly explored on cross-examination and go[es] to [the] testimony's weight and credibility — not its admissibility." *Int'l Bus. Machs. Corp.*, 2013 WL 1775437, at *16.

The same is true for Defendants' third and fourth arguments — that respondents should not have been allowed to view the stimuli as they answered questions and that the studies did not replicate real-world conditions. Defendants cite McCarthy for the proposition that "keeping the stimulus in view while questioning is usually only appropriate to assess point-of-sale confusion," rather than post-sale confusion. (Defs.' Ford/Mantis Mem. 5 (quoting 6 McCarthy on Trademarks & Unfair Competition § 32:171 (4th ed.))). Even the section of McCarthy that Defendants cite, however, states that the identified "deficiencies in the mechanics of surveys have been criticized by the courts, leading them to give a survey *little weight* as evidence," not that courts have excluded surveys on that basis. McCarthy § 32:171 (emphasis added); *see also*

*POM Wonderful LLC v. Organic Juice USA, Inc.*, 769 F.Supp.2d 188 (S.D.N.Y. 2011) (finding that argument that survey should have used a "memory" test rather than a "reading" test went to weight, not admissibility). Similarly, Defendants' argument that people ordinarily cannot take as long as they like to examine another person's sunglasses goes to the weight of the evidence. While someone passing by another person on the street likely would have only a few seconds to view the sunglasses, for example, a person sitting next to another on a train who had placed his or her sunglasses on his or her head would have much longer. Consequently, although the Court recognizes that the failure to simulate marketplace conditions can be grounds for exclusion, *see, e.g., Medisim Ltd. v. Bestmed LLC*, 861 F.Supp.2d 158, 166 (S.D.N.Y. 2012); *see also Am. Footwear Corp. v. Gen. Footwear Co. Ltd.*, 609 F.2d 655, 660 n.4 (2d Cir. 1979), the mere fact that respondents could view the sunglasses for longer than they may have been able to in the actual marketplace — particularly given the instruction to look at the sunglasses as one would if he or she saw someone wearing them — is not such a large deviation from actual conditions as to merit exclusion. (Ford Report 11; Lauridsen Ford/Mantis Decl., Ex. 3 ("Mantis Report") at 6.)

Defendants' challenge to the Survey Experts' controls is equally unavailing. In designing surveys to determine whether the marks LOUIS•V and LOUIS VALENTIN are likely to be confused with Louis Vuitton's marks, Ford and Mantis, respectively, used the controls Henri C and Henri Chalet. (Ford Report 3; Mantis Report 6). Defendants contend that these controls are so different from Louis Vuitton as to be meaningless. (Defs.' Ford/Mantis Mem. 7-8).[10] They

---

[10]    Defendants also contend that a "larger number of the responses for the Henri C control cells indicate that many respondents believed that the glasses were put out by Henrik Lundqvist, a New York Rangers hockey player." (Defs. Ford/Mantis Mem. 8). This argument borders on the absurd. As Defendants admit, the *only* evidence supporting this "assumption" is that "many respondents removed the space between Henri and C in the control cell responses," or "wrote various spellings of Henrik." (Defs. Ford/Mantis Mem. 8 n.3). Not one respondent mentioned either Henrik Lundqvist or the New York Rangers.

argue, for example, that Mantis should have used two French first names — and claim that he admitted as much during his deposition.  (Defs. Mem. 8).  But Mantis admitted no such thing. When asked if it would have been better to use two French first names, he responded: "Not necessarily, no."  (Lauridsen Ford/Mantis Decl., Ex. 4 at 263:22-264:2).  Both Henri Chalet and Henri C are French-sounding names similar enough to Louis Vuitton, LOUIS•V and LOUIS VALENTIN to have some usefulness as a control, but not so similar that they are themselves likely to be considered infringement of Louis Vuitton's marks.  There is therefore no indication that the controls used were so inadequate as to render the surveys inadmissible at trial.

Defendants also seek to have the surveys excluded on the grounds that the number of respondents was too small.  The Mantis survey had approximately 200 respondents each for the test and control cells (Mantis Report 4), while each cell of the Ford survey had approximately 100 respondents (Ford Report 2).  Defendants cite two cases — neither of which is from this Circuit — questioning the significance of a survey with 110 and 231 respondents, respectively. See *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 799 n.2 (6th Cir. 2004); *In re Spirits Int'l N.V.*, 2008 WL 375723, at *12 (T.T.A.B. Feb. 11, 2008).  (Defs.' Ford/Mantis Mem. 4).  Neither Court, however, excluded the survey on that basis.  Instead, they merely found it to be of limited probative value.  Consistent with these cases and others, the Court finds that, even if the Court were to accept Defendants' arguments that the sample sizes of the Ford and Mantis surveys are small, "small sample size goes to the weight, rather than to the reliability (and admissibility) of a study." *U.S. Inf. Sys., Inc.*, 313 F.Supp.2d at 232.

Lastly, the Court rejects Defendants' argument that the Ford and Mantis surveys examined the wrong universe.  It is well established that "a flawed universe minimizes the probative value of a survey and may lead to skewed results." *Malletier v. Dooney & Burke*, 525

F.Supp.2d 558, 630 (S.D.N.Y. 2007) (internal quotation marks omitted).  Here, the universe for both surveys consisted of individuals over the age of eighteen who were likely to purchase a pair of nonprescription sunglasses within the next year.  (Ford Report 6; Mantis Report 4).

Defendants assert that this universe was flawed because there was no guarantee that it included anyone who would purchase either Louis Vuitton's or Sunny's products.  (Defs. Ford/Mantis Mem. 3-4).  That concern, however, is insufficient to render the survey inadmissible.  Indeed, even one of the cases that Defendants cite, *General Motors Co. v. Urban Gorilla, LLC*, No. 06-CV-133 (BSJ), 2010 WL 5395065 (D. Utah Dec. 27, 2010), cuts against them.  In that case, the target markets of the two relevant products were potential buyers "of a $150,000 luxury vehicle" with "an income of about $200,000 a year" on the one hand and potential buyers of a "military-style off road vehicle" who are "middle to lower income" on the other.  *Id.* at *17.  While noting that those "with opinions relevant to the litigation are those who are potential or actual purchasers of both [products]," the Court found a survey universe of "consumer[s] who ha[d] purchased in the last three years or plan[ned] to purchase within the next three years a new or used four-wheel drive SUV with off-road capability" to be proper.  *Id.*  That universe is very similar to the ones at issue here.  Defendants may well be right that the limitations of the Survey Experts' data about the people surveyed greatly decrease the probative value of the surveys, but that concern is better dealt with through cross-examination, rather than exclusion.  *See, e.g.,* *Makinen v. City of N.Y.*, No. 11-cv-7535, – F.Supp.3d –, 2014 WL 5036747, at * 14 (S.D.N.Y. Sept. 30, 2014).

**C.    Proposed Redactions**

The Court turns, then, to the parties' requests to file the moving papers, Rule 56.1 statements and exhibits in redacted form.[11]  Throughout the litigation, the parties filed documents under seal.  On August 25, 2014, the Court granted the parties leave to file supplemental memoranda of law on whether the documents that the parties had designated confidential or highly confidential should be made public.  (Docket No. 97).  The parties both filed supplemental memoranda on September 17, 2014.  (*See, e.g.*, Louis Vuitton's Supp. Redaction Letter Mem. ("Pl.'s Redaction Letter") (Docket No. 125); Defs' Supp. Mem. Regarding Request to File Documents Under Seal ("Defs.' Redaction Letter") (Docket No. 127)).  Although the parties have since agreed to de-designate certain of their proposed redactions (Joint Letter September 26, 2014 (Docket No. 131)), others remain.  The Court will first address those redactions covered in the supplemental memoranda, before turning to those that were neither addressed nor de-designated.

Although the relevant documents are "judicial documents" subject to a common law and First Amendment presumption in favor of public access, *see, e.g.*, *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006), the Court finds that all of Plaintiff's proposed redactions in its supplemental memorandum and most of Defendants' in its corresponding memorandum are justified.  Specifically, in its supplemental memorandum, Louis Vuitton seeks to maintain under seal information relating to (1) its advertising expenditures and plans, (2) its merchandising strategies, polices and sales, and (3) its enforcement policies and investigation information.  (Pl.'s Redaction Letter 2-4).  Defendants seek to redact (or seal) several of Sunny's

---

[11]    Regardless of which party filed a document in redacted form or under seal, the Court will treat the party that designated the relevant information as confidential as the party requesting the redaction.

internal business documents, financial information about both Sunny and particular individuals, investigative reports, and information about Sunny's business operations.

Plaintiffs' proposed redactions are generally limited to specific business information and strategies, which, if revealed, "may provide valuable insights into a company's current business practices that a competitor would seek to exploit." *Encycl. Brown Prods., Ltd. v. Home Box Office, Inc.*, 26 F.Supp.2d 606, 614 (S.D.N.Y. 1998); *see also GoSMiLE, Inc. v. Levine*, 769 F.Supp.2d 630, 649-50 (S.D.N.Y. 2011). With a few exceptions that the Court addresses below, Defendants' redactions are also proper. Many of them relate to confidential business information regarding Sunny, a closed business, which implicates legitimate privacy interests. *Cf. U.S. v. Amodeo*, 71 F.3d 1044, 1051 (2d Cir.1995) ("Financial records of a wholly owned business . . . and similar matters will weigh more heavily against access than conduct affecting a substantial portion of the public"). Similarly, the information about Gene and Stanley Tsai's personal finances implicates their privacy interests and has "no public ramifications." *U.S. v. Strevell*, No. 05-CR-477 (GLS), 2009 WL 577910, at *4 (N.D.N.Y. Mar. 4, 2009).

A few of Defendants' proposed redactions are unwarranted. Namely, they have filed Exhibit 1 to the Stanley Tsai Declaration (Docket No. 73) under seal, but the only confidential information contained in that document is information about "the valuation of Sunny and the redistribution of its shares." (Defs.' Redaction Letter 2). That information can be redacted, so there is no need for the entire exhibit to remain sealed (the same is true with regard to sub-exhibit 5 to exhibit 14 of the Allan Declaration (Docket No. 124)). Further, with regard to Exhibit 2 of the same declaration, much of the information is already contained in un-redacted form in Defendants' brief. As such, there is no justification for keeping the information that has already been public under seal. *See, e.g., King Pharm., Inc. v. Eon Labs, Inc.*, No. 04–CV–5540 (DGT),

2010 WL 3924689, at *10 (E.D.N.Y. Sept. 18, 2010) (denying redaction request for information that was "already public."). For largely the same reason, there is no basis for redacting Plaintiff's discussion in its response to Sunny's additional facts of Sunny's use of the LA Dodgers logo on sunglasses: The fact that Sunny used the LA Dodgers logo and that it "ceased sales of the product" when it learned that the logo was trademarked is already public. (Pl's Response Defs.' Additional Facts ¶ 36).

Having addressed the proposed redactions covered in the parties' supplemental memoranda, the Court now turns to those redactions that were not addressed but that the Court considers problematic. Specifically, due to Plaintiff's designation of the material as confidential, Defendants filed under seal or in redacted form: Exhibits 5 and 7 to the Lauridsen Declaration filed in opposition to Plaintiff's motion for summary judgment (Docket No. 91); Exhibits 1 and 2 Part 2 to the Lauridsen Declaration in support of Defendants motion to exclude Mulhern (Docket No. 102); Exhibit 1 to the Lauridsen Declaration in Support of Defendants' motion to exclude Matlins (Docket No. 105); and Exhibits 1, 2, and 3 of the Lauridsen Declaration in support of Defendant's motion to exclude Ford and Mantis (Docket No. 108). Many of these exhibits are the expert reports that were the subject of the *Daubert* motion in this case. Exhibit 2 Part 2 to the Lauridsen Mulhern Declaration contains invoices from Mulhern to Louis Vuitton, while Exhibit 2 of the Lauridsen Ford/Mantis Declaration contains excerpts from Ford's deposition. All of these are judicial documents, and the public interest in each is high. Further, no party has provided any justification for why they should be kept confidential. Accordingly (with the exception of the redactions that the Court approved above, Sunny's sales figures contained in the Mulhern Report, and any personal information about Mulhern contained in the invoices), there is no basis for maintaining these exhibits under seal.

## CONCLUSION

For the reasons stated above, Plaintiff's motion for partial summary judgment (Docket No. 47) is GRANTED in part and DENIED in part, while Defendants' motion for partial summary judgment (Docket No. 52) is GRANTED in part and DENIED in part. Plaintiff's request to strike Defendants' additional responsive facts (Docket No. 123) is DENIED, and all of Defendants' non-*Daubert* evidentiary objections (Docket No. 89) are OVERRULED. Defendants' motions to exclude the testimony and reports of Mulhern (Docket No. 99), and that of Mantis and Ford (Docket No. 106) are DENIED, while its motion to exclude Matlins's testimony (Docket No. 103) is DENIED in part and GRANTED in part. Further, both parties requests for redactions (except for those which it has agreed to de-designate) are GRANTED in part and DENIED in part. The parties shall immediately file on ECF copies of the relevant documents containing only the approved redactions.

The Clerk of Court is therefore directed to terminate Plaintiff's motion for partial summary judgment (Docket No. 47), Defendants' motion for partial summary judgment (Docket No. 52), and Defendants' motions to exclude the testimony and reports of Mulhern (Docket No. 99), Mantis and Ford (Docket No. 106), and Matlins (Docket No. 103).

SO ORDERED.


DATED:      New York, New York
            March 31, 2015


                                    LORETTA A. PRESKA
                                    Chief U.S. District Judge